IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHAEL HEARN
individually and on behalf of all
other similarly situated consumers,

    Plaintiff,

       v.

    CIVIL ACTION FILE
NO. 1:19-CV-1198-TWT

COMCAST CABLE
COMMUNICATIONS, LLC,

    Defendant.

## OPINION AND ORDER

This is a class action under the Fair Credit Reporting Act. It is before the Court on Defendant Comcast Cable's Motion to Compel Individual Arbitration and Stay Litigation [Doc. 6]. For the reasons set forth below, Defendant Comcast Cable's Motion to Compel Individual Arbitration and Stay Litigation [Doc. 6] is DENIED.

## I.    Background

### A.  The Plaintiff's Claim

The Plaintiff Michael Hearn alleges that he called Defendant Comcast Cable Communications to inquire about its services on or about March 5, 2019. Class Action Compl. ¶ 8. During the call, a representative for the Defendant made a "hard pull" of the Plaintiff's consumer report, damaging his credit

score. *Id.* ¶¶ 12-14. The Plaintiff alleges that he did not consent to a credit check, was not a customer of the Defendant at the time, and did not request any services before or after the Defendant pulled his consumer report. *Id.* ¶¶ 9-10. The Plaintiff alleges that the Defendant obtained the Plaintiff's consumer report for an "impermissible purpose" in violation of various provisions of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. *Id.* ¶¶ 37-46. The Plaintiff sues on behalf of two putative classes of Georgia residents whose consumer reports were either (1) impermissibly accessed or (2) impermissibly used by the Defendant. *Id.* ¶ 22.

## B. The Arbitration Provision

The Defendant argues that the Plaintiff's FCRA claim is covered by an arbitration agreement previously entered into by the parties. The Plaintiff contracted with the Defendant for services at his current address from December of 2016 through August of 2017.[1] The Plaintiff signed a work order

---

[1] The Defendant has submitted two declarations from its Director of Regulatory Compliance, Nicole Patel, in which she testifies that the Plaintiff previously contracted for services with the Defendant and that the purpose of the Plaintiff's March 2019 call was to inquire about reconnecting services. *See* Patel Decl., Ex. A to Def.'s Mot. to Compel Arbitration [Doc. 6-1]; Patel Suppl. Decl., Ex. A to Def.'s Reply in Supp. of Mot. to Compel Arbitration [Doc. 18-1]. Attached to Ms. Patel's first declaration is an "Agreement for Residential Services" (the "2016 Service Agreement") and a signed work order from 2016 (the "2016 Work Order"). *See* Ex. 1 to Patel Decl. [Doc. 6-2]; Ex. 2 to Patel Decl. [Doc. 6-3]. The Plaintiff has submitted his own declaration in which he admits to previously receiving services but denies that the purpose of the March 2019 call was to inquire about reconnecting services. Hearn Decl., Ex. A to Pl.'s Resp. to Mot. to Compel Arbitration [Doc. 16-1].

on December 20, 2016, acknowledging receipt of a "Comcast Welcome Kit" that contained, inter alia, the 2016 Service Agreement. *See* 2016 Work Order, at 3. The first page of the 2016 Service Agreement notifies the customer that "**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION IN SECTION 13 THAT AFFECTS YOUR RIGHTS UNDER THIS AGREEMENT WITH RESPECT TO ALL SERVICE(S).**" *See* 2016 Service Agreement, at 1 (emphasis in original). The arbitration provision in Section 13 of the Agreement states that it is governed by the Federal Arbitration Act and covers "[a]ny Dispute involving [the customer] and Comcast." *Id.* § 13(a). The provision defines the term "Dispute" as:

> any claim or controversy related to Comcast, including but not limited to any and all: (1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that arose before this or any prior Agreement; (3) claims that arise after the expiration or termination of this Agreement, and (4) claims that

---

In adjudicating the Defendant's motion to compel arbitration, the Court is not limited to the four corners of the Plaintiff's complaint. *See Liles v. Ginn-La West End, Ltd.*, 631 F.3d 1242, 1244 n.5, 1249 n.13 (11th Cir. 2011) (noting that a court can consider extrinsic evidence in a motion to change venue and that a motion to compel arbitration is essentially a specialized motion to change venue). The Court will therefore consider the parties' testimonial and documentary evidence in adjudicating the Defendant's motion. But, because the Court must apply a "summary-judgment-like" standard to factual disputes on a motion to compel arbitration, it will view the evidence in the light most favorable to the Plaintiff. *In re Checking Account Overdraft Litig.*, 754 F.3d 1290, 1294 (11th Cir. 2014) (holding that an order compelling arbitration is "in effect a summary disposition of the issue of whether or not there has been a meeting of the minds on the agreement to arbitrate") (quoting *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 785 (11th Cir. 2008)).

are currently the subject of purported class action litigation in which you are not a member of a certified class.

*Id.* § 13(b). The provision states that the customer has the right to opt out of arbitration by notifying the Defendant's legal department in writing within thirty days of receipt of the Agreement. *Id.* § 13(d). [2] The provision further states that the customer waives his or her right to arbitrate or litigate claims against the Defendant in a collective action. *Id.* § 13(h). Finally, the provision contains a survival clause stating that the parties' agreement to arbitrate survives termination of the Agreement. *Id.* § 13(k).

The Defendant contends that the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, governs the arbitration provision contained within the 2016 Service Agreement and that the Plaintiff's FCRA claim falls within its broad scope. The Defendant argues that the Court should therefore stay these proceedings pending arbitration of the Plaintiff's FCRA claim. *See* 9 U.S.C. §§ 3-4. The Federal Arbitration Act covers any arbitration provision that is (1) in writing and (2) is part of a contract "evidencing a transaction involving [interstate] commerce." 9 U.S.C. § 2; *see also Klay v. All Defendants*, 389 F.3d 1191, 1200 n.9 (11th Cir. 2004). The Plaintiff does not dispute that the arbitration

---

[2] The customer has the option of notifying the legal department by mail or through an online portal accessible through the Defendant's website. *Id.* Ms. Patel testifies, and the Plaintiff does not contest, that the Plaintiff never notified that the Defendant that he was opting out of the arbitration provision contained within the 2016 Service Agreement. Patel Decl. ¶¶ 10-12.

provision is in writing and that, by contracting for telecommunications services, the parties engaged in a transaction involving interstate commerce. Therefore, the Court will consider and apply precedent construing the Federal Arbitration Act in adjudicating the Defendant's motion.

## II.     Legal Standard

The Federal Arbitration Act "embodies a liberal federal policy favoring arbitration agreements." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005) (citation and punctuation omitted). Section 2 of the Federal Arbitration Act provides in relevant part that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. When considering a motion to compel arbitration pursuant to the Federal Arbitration Act, the Court must first "determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985). If they have, the Court must then determine whether the arbitration clause is valid. It may be unenforceable on grounds that would permit the revocation of any contract, such as fraud or unconscionability. *See id.*, at 627 ("[C]ourts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds

T:\ORDERS\19\Hearn\mcatwt.docx

'for the revocation of any contract.'"). There may also be legal constraints precluding arbitration, such as a clear congressional intention that a certain claim be heard in a judicial forum. *See id.*, at 628 ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.").

The Court must apply state laws of contract to resolve questions regarding the "validity, revocability, and enforceability" of arbitration agreements. *Caley*, 428 F.3d at 1368 (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)). The Court does so, however, in light of the strong federal policy favoring arbitration. *Id.* (citing *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 498 (6th Cir. 2004)). "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983). If the moving party establishes the necessary elements, "the FAA requires a court to either stay or dismiss a lawsuit and to compel arbitration." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008).

### III. Discussion

The Defendant argues that the arbitration provision is valid and compels arbitration of the Plaintiff's FCRA claim. The Plaintiff makes three

6

arguments in response. First, the Plaintiff argues that he ceased to be bound by the arbitration provision of the 2016 Service Agreement when he terminated the Defendant's services in August of 2017. Second, the Plaintiff argues that his FCRA claim is beyond the scope of the arbitration provision because they do not relate to the 2016 Service Agreement. Third, the Plaintiff argues that if the arbitration provision requires arbitration of claims unrelated to the 2016 Service Agreement, then the provision is unenforceable because it is unconscionable.

## A. Whether the Arbitration Provision Continues to Bind the Parties

The Plaintiff does not dispute that he entered into the 2016 Service Agreement when he purchased services from the Defendant in December of 2016.[3] The Plaintiff argues, however, that he is no longer bound by the arbitration provision because he terminated the 2016 Service Agreement two years before the events giving rise to this lawsuit. Section 9(b) of the Agreement permits customers to terminate the Agreement "for any reason at any time" by, among other options, calling the Defendant's customer service line during normal business hours. 2016 Service Agreement § 9(b). The

---

[3]    In other cases involving this Defendant, courts in this district have routinely held that customers accept the terms of their service agreements when they sign work orders acknowledging receipt of the agreements and accept the benefits of continued service without objection. *Cf. Honig v. Comcast of Georgia I, LLC*, 537 F. Supp. 2d 1277, 1283-84 (N.D. Ga. 2008); *Losapio v. Comcast Corp.*, No. 1:10-CV-3438-RWS, 2011 WL 1497652, at *3 (N.D. Ga. Apr. 19, 2011) (citing *Honig*, 537 F. Supp. 2d at 1283-84).

7

Plaintiff called the Defendant and cancelled his services in August of 2017. Hearn Decl. ¶ 3. At that time, he also confirmed that no outstanding balance remained due on his account. *Id.* ¶ 4. The Plaintiff argues that any agreement to arbitrate was necessarily extinguished when he cancelled the 2016 Service Agreement.

The Court is not persuaded. The Plaintiff's argument contravenes the express language of the arbitration provision's survival clause, which states that "[t]his Arbitration Provision shall survive the termination of your Service(s) with Comcast." 2016 Service Agreement § 13(k). The survival clause unambiguously reflects the parties' intent that their agreement to arbitrate would survive termination of the 2016 Service Agreement. The Plaintiff argues that the survival clause somehow renders the termination provision "ambiguous," and that this ambiguity must be resolved against the Defendant as the drafter of the Agreement. But the termination provision and the arbitration provision are not in conflict. The termination provision explains how the parties can terminate the 2016 Service Agreement, and the arbitration provision's survival clause explains that the parties' agreement to arbitrate survives termination of the 2016 Service Agreement. Because the plain language of the contract makes the parties' intentions clear, the Court need not apply rules of contract construction to manufacture ambiguity where none exists.

Based on the plain language of the contract, the Court concludes that

8

the parties intended for the arbitration provision to survive termination of the 2016 Service Agreement. The Court will therefore compel arbitration of the Plaintiff's FCRA claim unless, as the Plaintiff argues in the alternative, they fall outside the scope of the arbitration provision or the arbitration provision is unenforceable on unconscionability grounds.

## B. Whether the Plaintiff's FCRA Claim is Within the Scope of the Arbitration Provision

The Plaintiff argues that his FCRA claim is wholly unrelated to the 2016 Service Agreement and that it is therefore beyond the scope of the Agreement's arbitration provision. The Defendant responds that the plain language of the arbitration provision states that it reaches any claim "related to Comcast," such that claims unrelated to the 2016 Service Agreement fall under the provision's broad scope. *Id.* § 13(b). The Defendant argues in the alternative that the Plaintiff's FCRA claim is, in fact, related to the 2016 Service Agreement and that the arbitration provision therefore covers the Plaintiff's FCRA claim even if the Court subjects it to a limiting construction.

### 1. Whether the Arbitration Provision Covers Unrelated, Post-Expiration Claims

The Defendant describes the arbitration provision in the 2016 Service Agreement as "broad," but that term is inadequate to capture the true breadth of its substantive and temporal scope. Typically, courts define arbitration provisions as "broad" when they purport to cover all claims "arising out of" or "relating to" the underlying agreement. *See Telecom Italia, SpA v. Wholesale*

9

*Telecom Corp.*, 248 F.3d 1109, 1114 (11th Cir. 2001) (noting that "standard arbitration clause[s]" in commercial contracts "broadly state[] that 'any controversy or claim arising out of, or relating to this agreement, or the breach thereof[,]' shall be settled by arbitration") (quoting Joseph T. McLaughlin, Arbitrability: *Current Trends in the United States*, 59 Alb. L.Rev. 905, 932 (1996)); *see also Red Brick Partners-Brokerage, LLC v. Staubach Co.*, No. 4:08CV82-SPM-WCS, 2008 WL 2743689, at *3 (N.D. Fla. July 9, 2008) ("The arbitration clause in the Sublicense Agreement includes the 'arising out of or relating to' language and is thus a broad clause.") (citing *Prima Paint Corp. v. Floor & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967)); *Johnson Law Grp. v. Elimadebt USA, LLC*, No. 09-81331-CIV, 2010 WL 11558229, at *2 (S.D. Fla. Mar. 11, 2010) (finding that an arbitration clause providing for arbitration of "any controversy or claim arising out of or relating to this Agreement" was "broad" rather than "narrow" because it "evidence[d] the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause") (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218 (2d Cir. 2001)); *Collins v. Susan Schein Chrysler Dodge, Inc.*, No. 06-CV-00841-RRA, 2006 WL 8436810, at *1 (N.D. Ala. June 22, 2006) ("In construing arbitration clauses, courts have, at times, distinguished between broad clauses that purport to arbitrate all disputes arising out of a contract, from narrow clauses that limit arbitration to specific disputes."), *report and recommendation adopted*, No. 06-CV-00841-

10

RRA, 2006 WL 8436806 (N.D. Ala. July 11, 2006). This language of "arising out of" or "related to" is included in standard arbitration clauses in commercial contracts because it tracks the language of the FAA. *See* U.S.C. § 2.

In determining whether a dispute "relates to" an agreement, courts ask whether the dispute "was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia, SpA*, 248 F.3d at 1116. Otherwise, the term "related to" would "stretch to the horizon and beyond." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011). Unlike the standard arbitration clauses typically found in commercial contracts, the arbitration provision at issue in this case lacks language limiting the scope of arbitrable claims to those "arising out of" or "relating to" the 2016 Service Agreement. The arbitration provision is limited only by the requirement that the claim be "related to Comcast."[4] 2016 Service Agreement § 13(b). This is, of course, no limit at all, as any claim brought against Comcast necessarily "relates" to it in some way. The arbitration provision also specifies that it covers claims arising before, during, or after the contract period. *Id.* § 13(b). If, as the Defendant contends, the contractual language reflects the parties' mutual understanding of their agreement to arbitrate, then any claim that the Plaintiff has or might ever have against the Defendant falls within its unbounded scope. For

---

[4] Although not relevant in this case, the arbitration provision also permits either party to bring claims in small claims court. *Id.* § 13(f).

example, if the Plaintiff was run over by a Comcast truck, he would be required to submit his personal injury claim to arbitration.

The Defendant has not identified a single case in which a court has compelled arbitration of a claim that was (1) unrelated to the agreement containing the arbitration provision and (2) arose after the arbitration provision had expired. Indeed, the case law interpreting arbitration provisions like the one at issue in this case is sparse and largely unfriendly to the Defendant's position. In the Seventh Circuit case *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003), the court highlighted the problems that could arise if courts began enforcing arbitration agreements untethered to an underlying commercial contract or transaction. In *Steinkamp*, the plaintiffs brought federal Racketeer Influenced and Corrupt Organizations Act claims against a payday loan company for making usurious loans. *Id.*, at 775-76. The loan company moved to compel arbitration based on an arbitration agreement that the plaintiffs signed when taking out prior loans from the payday lending company. *Id.*, at 777. Crucially, however, the plaintiffs had not signed any arbitration agreements when taking out the loans that gave rise to their RICO claims. *Id.*

The Seventh Circuit ultimately concluded that the arbitration provision did not on its face extend to future claims, and upheld the lower court's denial of the motion to compel arbitration on that basis. *Id.*, at 778. But the court aptly described the "absurd results" that could ensue if the court were to

12

construe the arbitration provision to cover future, unrelated claims:

> If [the arbitration provisions] are read as standing free from any loan agreement, absurd results ensue, for example that if Instant Cash murdered Smith in order to discourage defaults and her survivors brought a wrongful death suit against Instant Cash (a "common law" suit, thus encompassed by [the arbitration provisions]), Instant Cash could insist that the wrongful death claim be submitted to arbitration. For that matter, if an employee of Instant Cash picked Smith's pocket when she came in to pay back the loan, and Smith sued the employee for conversion, he would be entitled to arbitration of her claim. It would make no difference that the conversion had occurred in Smith's home 20 years after her last transaction with Instant Cash.

*Id.*, at 777. Although not necessary to the holding, the court reasoned that an arbitration provision that stretched to reach such claims "might be thought unconscionable." *Id.*, at 777-78. Using *Steinkamp* as a jumping off point, district courts in the Northern District of California, the Eastern District of New York, the Southern District of California, and—most recently—the Northern District of Georgia have declined to compel arbitration of claims unrelated to the parties' contractual relationship, even though the arbitration provisions at issue lacked language tethering them to the underlying agreements. *See In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253 (S.D. Cal. 2012); *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500 (E.D.N.Y. 2016); *Revitch v. DirecTV, LLC*, No. 18-CV-01127-JCS, 2018 WL 4030550 (N.D. Cal. Aug. 23, 2018); *Cordoba v. DIRECTV, LLC*, 347 F. Supp. 3d 1311 (N.D. Ga. 2018).

In *In re Jiffy Lube*, 847 F. Supp. 2d at 1258, the defendant sought to

compel arbitration of the plaintiffs' Telephone Consumer Protection Act claims pursuant to an arbitration provision found on invoices that the plaintiffs signed for oil change services. The arbitration provision was "incredibly broad" and purported to cover "any and all disputes" between the parties. *Id.*, at 1262. The district court for the Northern District of California reasoned that the plaintiffs' TCPA claims were wholly unrelated to the oil change services previously rendered to the plaintiffs and that enforcement of the arbitration provision to cover unrelated claims "would clearly be unconscionable." *Id.*, at 1262-63.

In *Wexler v. AT & T Corp.*, 211 F. Supp. 3d at 504, the district court for the Eastern District of New York declined to enforce a similarly broad arbitration provision in a cell phone services contract to compel arbitration of the plaintiff's TCPA claim. [5] Rather than rely on the doctrine of unconscionability, however, the court framed the problem as one of contract formation. *Id.*, at 504.[6] The court reasoned that under New York contract law

---

[5]     The arbitration provision at issue stated in relevant part that "AT & T and you agree to arbitrate all disputes and claims between us," including but not limited to "claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory[,]" that may arise before, during, or after the contract period. *Id.*, at 501.

[6]     The *Wexler* court was concerned that the *In re Jiffy Lube* court's reliance on the doctrine of unconscionability was in tension with the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 352 (2011). In *Concepcion*, the Supreme Court held that the Federal Arbitration Act preempted a California judicial rule of law that class action waivers in

"the words expressed must be judged according to 'what an objective, reasonable person would have understood them to convey.'" *Id.* Therefore, "notwithstanding the literal meaning of the clause's language, no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider[.]" *Id.*

In *Revitch v. DirecTV, LLC*, No. 18-CV-01127-JCS, 2018 WL 4030550, at \*2-\*3, the defendant telecommunications company sought to compel arbitration of the plaintiff's TCPA claim based on a broad arbitration provision in the plaintiff's wireless services agreement. The arbitration provision purported to reach "all disputes and claims" between the parties, regardless of whether they were related to the underlying services agreement. *Id.* The district court for the Southern District of California "agree[d] with the Court in *Wexler* that the broad interpretation of the arbitration provision advanced by [the defendant] leads to absurd results[.]" *Id.*, at \*15. Relying on the common law rule "requiring that contracts be construed to avoid absurd results," the court concluded that "no reasonable consumer" would enter into a wireless services contract that would "subject to arbitration not only disputes that might arise with the service provider relating to that service but virtually any sort of dispute the customer might have against any entity that might in the

---

contracts of adhesion are unconscionable.

future be acquired by the holding company that owns the service provider." *Id.*

In *Cordoba v. DIRECTV, LLC*, 347 F. Supp. 3d at 1320-21, the defendant broadcast satellite services provider sought to compel arbitration of the plaintiff's Satellite Television Extension and Localism Act claim pursuant to an arbitration provision found in the plaintiff's customer services agreement. The arbitration provision purportedly reached "all disputes and claims between [the parties]," including but not limited to "claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory[.]"[7] *Id.*, at 1320.

The district court for the Northern District of Georgia declined to adopt the broad interpretation of the provision urged by the defendant, reasoning that the Federal Arbitration Act "requires that the controversy 'aris[e] out of' the contract between the parties" and that the Eleventh Circuit and other circuit courts therefore "require that the claim have some relationship to the contract containing the arbitration provision." *Id.*, at 1321-22 (citing 9 U.S.C. § 2; *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985); *Telecom Italia, SpA*, 248 F.3d at 1116 ("Disputes that are not related—with at least some directness—to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the

---

[7] *Id.*, at 1320.

standard arbitration clause."); *Jones v. Halliburton Co.*, 583 F.3d 228, 238 (5th Cir. 2009); *3M Co. v. Amtex Sec., Inc.*, 542 F.3d 1193, 1199 (8th Cir. 2008); *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005); *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003); *Fazio v. Lehman Bros.*, 340 F.3d 386, 395 (6th Cir. 2003); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001); *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999); *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993); *J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)). The court found that no such relationship existed between the plaintiff's STELA claim and the customer services agreement and declined to compel arbitration. *Id.*, at 1322-24.

The Court agrees with its district court colleagues that absurd results would inevitably ensue if federal courts began compelling arbitration of claims that are substantively and temporally unmoored from the agreements containing the arbitration provisions. The Court is persuaded by the decisions in *Wexler* and *Revitch* that the problem is fundamentally one of contract formation. Although the *Wexler* and *Revitch* courts applied, respectively, New York and California state law of contract formation, the fundamental contract principles on which those decisions rest apply with equal force under Georgia law. "In determining if parties had the mutual assent or meeting of the minds necessary to reach agreement, [Georgia] courts apply an objective theory of

intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent." *Cox Broad. Corp. v. Nat'l Collegiate Athletic Ass'n*, 250 Ga. 391, 395 (1982) (citations omitted). Furthermore, under Georgia law "[a] contract must be given a reasonable construction which will uphold and enforce the instrument, if possible, rather than a construction which would... lead to an absurd result." *Tudor v. Am. Emp. Ins. Co.*, 121 Ga. App. 240, 242 (1970) (quoting *Brown v. Chrysler Corporation*, 112 Ga. App. 22, 23 (1965)) (cited with approval in *Kwok v. Delta Air Lines Inc.*, 578 F. App'x 898, 902 (11th Cir. 2014)).

Applying these state law rules of contract formation to this case, the Court concludes that no reasonable customer would have understood himself to be signing over his right to pursue any claim against the Defendant in perpetuity simply by signing a work order acknowledging receipt of the 2016 Service Agreement. Nor does the Court believe that a reasonable company in the Defendant's position could understand the customer's "manifestation[] of assent" to affect an absolute waiver of the customer's right to sue the Defendant in state or federal court with respect to claims unrelated to the 2016 Service Agreement. The Court is further persuaded by the fact that the arbitration provision in the 2016 Service Agreement deviates from the statutory language of the Federal Arbitration Act, which by its terms covers written provisions "to settle by arbitration a controversy thereafter *arising out*

*of*" a contract or transaction involving interstate commerce. 9 U.S.C. § 2 (emphasis added).

While federal policy strongly favors arbitration, "[a]rbitration under the [Federal Arbitration] Act is a matter of consent, not coercion[,]" *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford, Jr. Univ.*, 489 U.S. 468, 479 (1989), and a party "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986) (citation and punctuation omitted). Applying relevant principles of Georgia contract law, the Court concludes that no reasonable customer in the Plaintiff's position could have manifested his assent to arbitrate future, unrelated claims simply by acknowledging receipt of the 2016 Service Agreement. As the Supreme Court noted in *Litton Fin. Printing Div., a Div. of Litton Bus. Sys., Inc. v. N.L.R.B.*, "[t]he object of an arbitration clause is to implement a contract, not to transcend it." 501 U.S. 190, 205 (1991).

The arbitration provision at issue in this case is an attempt to do just that. The Court will not embrace the Defendant's attempt to extend the scope of arbitrable claims past the point that any reasonable customer would expect it to go. The Court will therefore decline to compel arbitration of the Plaintiff's FCRA claim unless the Defendant can show that it "relates to" or "arises out of" the 2016 Service Agreement.

## 2. Whether the Plaintiff's FCRA Claim is Related to the 2016 Service Agreement

The Defendant argues that it was only able to pull the Plaintiff's consumer report during the March 2019 call because it already had the Plaintiff's personal information, including the Plaintiff's social security number, on file. But for the parties' prior contractual relationship, the Defendant argues, the alleged FCRA violation would have been impossible. Thus, the Plaintiff's FCRA claim necessarily "relates to" the 2016 Service Agreement. The Defendant further argues that Section 2(g) of the 2016 Service Agreement specifically states that "[r]econnection of the Service(s) is subject to our credit policies, this Agreement, and applicable law." 2016 Service Agreement § 2(g). The Defendant's Director of Regulatory Compliance, Nicole Patel, testifies that the Defendant ran a credit check only after the Plaintiff inquired about reconnecting services at his current address. Patel Suppl. Decl. ¶¶ 5-6. Because reconnection of services is subject to the 2016 Service Agreement, the Defendant argues, adjudication of the Plaintiff's claim necessarily implicates the parties' rights and obligations set forth in the 2016 Service Agreement.

The Court is not persuaded. "[A] dispute does not 'arise out of...' a contract just because the dispute would not have arisen if the contract 'had never existed.'" *Int'l Underwriters AG v. Triple I: Int'l Invs., Inc.*, 533 F.3d 1342, 1347 (11th Cir. 2008) (quoting *Seaboard Coast Line R.R. Co. v. Trailer*

20

*Train Co.*, 690 F.2d 1343, 1350-51 (11th Cir. 1982)). Rather, the test for determining whether a dispute "relates to" or "arises out of" a contract is whether the dispute "was an immediate, foreseeable result of the performance of contractual duties." *Telecom Italia, SpA*, 248 F.3d at 1116. The Plaintiff bases his claim on his rights under the FCRA, not the 2016 Service Agreement. *Cf. Gamble v. New England Auto Fin., Inc.*, 281 F. Supp. 3d 1354, 1359 (N.D. Ga. 2017) (holding that the plaintiff's claim that the defendant auto financer violated the TCPA by sending unsolicited texts offering a new loan was not related to the parties' prior loan agreement), *aff'd*, 735 F. App'x 664 (11th Cir. 2018). The Plaintiff does not allege that the Defendant's performance of its contractual duties, inadequate or otherwise, gave rise to the FCRA violation. And, while the Defendant asserts that the Plaintiff was trying to reconnect services at his address, that fact is in dispute. *Compare* Hearn Decl. ¶ 5 ("In March, 2019, I called Comcast to inquire about their services and pricing to determine whether to enter into a new service agreement with Comcast. I had no intention or discussion concerning reactivating my prior account."); *with* Patel Suppl. Decl. ¶ 5 ("Comcast's business records reflect that Plaintiff placed a call to Comcast on March 5, 2019 about reconnecting Comcast services at his Mableton address. During the call, a Comcast Customer Service Representative ("CSR") verified Plaintiff's personal information on file for the Mableton Account and confirmed that he was seeking to reconnect services at

the Mableton address.").[8] At this stage of the litigation, the Court must resolve all factual disputes in favor of the Plaintiff. *See In re Checking Account Overdraft Litig.*, 754 F.3d at 1294. The Court concludes that the Plaintiff's FCRA claim does not relate to the 2016 Service Agreement and therefore does not fall within the scope of the parties' agreement to arbitrate. The Defendant's motion to compel arbitration should therefore be denied. Because the Court has determined that the parties did not agree to arbitrate the Plaintiff's FCRA claim, it does not reach the question of whether enforcement of the arbitration provision would be unconscionable.

## IV. Conclusion

For the reasons stated above, Defendant Comcast Cable's Motion to Compel Individual Arbitration and Stay Litigation [Doc. 6] is DENIED.

SO ORDERED, this 21 day of October, 2019.

/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge

---

[8]     Although Ms. Patel references the Defendant's "business records" pertaining to the March 2019 call, the records themselves have not been submitted for the Court's review.

T:\ORDERS\19\Hearn\mcatwt.docx